In re AIR CRASH DISASTER AT SIOUX CITY, IOWA ON JULY 19, 1989.

MDL No. 817.
No. 89 C 8082.

United States District Court, N.D. Illinois, E.D.

Dec. 3, 1990.

Francis Patrick Murphy, Corboy & Demetrio, Chicago, Ill., Norman J. Barry, Daniel Cummings, Alan J. Madans, Rothschild, Barry & Myers, Chicago, Ill., Edmund W. Sinnott, Michael W. West, Pope, Ballard, Shepard & Fowle, Ltd., Chicago, Ill., Richard J. Leamy, Wiedner & McAuliffe, Ltd., Chicago, Ill., Arthur Sherman, Michael A.K. Dan, Sherman, Dan & Portugal, P.C., Beverly Hills, Cal., Jamie Lebovitz, Nurenberg, Plevin, Heller & McCarthy, Cleveland, Ohio.

John W. Adler, Fred C. Begy, III, Richard A. Walker, Adler, Kaplan & Begy, Chicago, Ill., Charles W. Douglas, H. Blair White, Sara J. Gourley, Sidley & Austin, Chicago, Ill., Michael J. Merlo, Craig A. Chapello, Pretzel & Stouffer, Chtd., Chicago, Ill., Steven L. Hogan, Bryan, Cave, McPheeters & McRoberts, Los Angeles, Cal., Allan Kanner, Philadelphia, Pa., Phillip B. Allen, Coale, Kananack & Mergatroyd, Los Angeles, Cal., Mark B. Decof, Decof & Grimm, Providence, R.I.

## MEMORANDUM OPINION AND ORDER

ELAINE E. BUCKLO, United States Magistrate Judge.

On July 19, 1989, a United Airlines DC–10 airplane manufactured by McDonnell Douglas Corporation crashed during an emergency landing at Sioux City, Iowa. As a result, 112 of the 296 people aboard the aircraft died. Beginning the day after the crash, many lawsuits have been filed against United, McDonnell Douglas and others. Forty-seven of those cases have been consolidated in the Northern District of Illinois for pretrial purposes by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407. Plaintiffs in these cases have sought discovery of documents relating to the aircraft and its engines.

McDonnell Douglas and another defendant, General Electric Corporation, which manufactured the CF–6 engines in the aircraft, have refused to produce certain documents on the ground that they are covered by the attorney-client privilege or are work product under Rule 26, Fed.R.Civ.P. Plaintiffs have moved to compel production of these documents. General Electric and McDonnell Douglas have filed cross motions for protective orders.

General Electric has claimed both attorney-client privilege and work product as to most of the documents it has declined to produce. While many of the documents constitute work product under Rule 26(b), Fed.R.Civ.P., the additional claim of attorney-client privilege (which in many cases, as will be seen, has not been sustained), has resulted in greatly increasing the amount of work involved in evaluating the claims of privilege in this case.

■ Although most of the applicable principles regarding the attorney-client privilege are well known I will review them briefly here since their applicability determines many of the claims in issue. First, of course, the Seventh Circuit has adopted Wigmore's formulation of the privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived. 8 *Wigmore* § 9922.

*United States v. Lawless,* 709 F.2d 485, 487 (7th Cir.1983); *Radiant Burners, Inc. v. American Gas Association,* 320 F.2d 314, 319 (7th Cir.), *cert. denied,* 375 U.S. 929, 84 S.Ct. 330, 11 L.Ed.2d 262 (1963). Second, "the party seeking to invoke the privilege has the burden of establishing all of its essential elements." *United States v. Lawless, supra,* 709 F.2d at 487. Third, a claim of privilege must be established on a document by document basis. *Id.* Fourth, the "scope of the privilege should be 'strictly confined within the narrowest possible

limits.'" *Id.,* quoting from 8 *Wigmore, Evidence* § 2291 (McNaughton rev. 1961).

> When the privilege shelters important knowledge, accuracy declines. Litigants may use secrecy to cover up machinations, to get around the law instead of complying with it. Secrecy is useful to the extent it facilitates the candor necessary to obtain legal advice. The privilege extends no further.

*Matter of Feldberg,* 862 F.2d 622, 627 (7th Cir.1988).

Applying these principles, the Seventh Circuit has held that not every disclosure from client to attorney is entitled to protection from discovery. "The privilege 'protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.'" *Matter of Walsh,* 623 F.2d 489, 494 (7th Cir.1980), quoting from *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). Furthermore, communications from attorney to client are privileged only to the extent that they reveal confidential information furnished by the client. *Ohio–Sealy Mattress Mfg. Co. v. Kaplan,* 90 F.R.D. 21, 28 (N.D.Ill.1980). *Accord, United States v. (Under Seal),* 748 F.2d 871, 877 (4th Cir.1984); *Mead Data Central, Inc. v. United States Department of the Air Force,* 566 F.2d 242, 254 (D.C.Cir.1977).

■ Disclosure of a document or an otherwise confidential communication to third persons waives the privilege. *In re Pebsworth,* 705 F.2d 261, 263 (7th Cir.1983). Most courts have held, however, that simply because a final product is disclosed to the public (or a third person), an underlying privilege attaching to drafts of the final product is not destroyed. *E.g., Matter of Feldberg, supra,* 862 F.2d at 629 (by implication); *SEC v. Texas International Airlines, Inc.,* 1979 CCH Transfer Binder, Fed.Sec.L.Rep. ¶ 96,945 (D.D.C.1979); *Carey–Canada, Inc. v. California Union Ins. Co.,* 118 F.R.D. 242, 247–48 (D.D.C.1986); *but see United States v. (Under Seal),* 748 F.2d 871, 875 and n. 7 (4th Cir.1984) (details

underlying published data, including drafts, are not privileged).[1]

■ In keeping with the principle that the attorney-client privilege is to be strictly and narrowly construed, the courts have also held that a document prepared for both legal and non-legal review is not privileged. *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 403 (8th Cir.1987), *cert. denied*, 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987); *FTC v. TRW, Inc.*, 479 F.Supp. 160, 163 (D.D.C.1979), *aff'd*, 628 F.2d 207 (D.C. Cir.1980); *United States v. International Business Machines Corp.*, 66 F.R.D. 206, 213 (S.D.N.Y.1974). In addition, although a document is sent to an attorney, if the role of counsel is "minor or perfunctory or was intended merely to immunize the documents from production, the privilege would not apply." *SEC v. Texas Int'l Airlines, Inc., supra.* The "person consulted must be functioning in the professional capacity of a lawyer." *Matter of Feldberg, supra,* 862 F.2d at 627. If the lawyer is acting merely as a custodian, for example, there is no privilege attached to the communication. *Id.* at 626–27.

■ The work product doctrine is "distinct from and broader than the attorney-client privilege." *United States v. Nobles,* 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 2170 n. 11, 45 L.Ed.2d 141 (1974); *In re Special September 1978 Grand Jury,* 640 F.2d 49 (7th Cir.1980).[2] It applies to documents prepared by either client or attorney "prepared in anticipation of litigation or for trial." *Id.;* Rule 26(b)(3). In the present case, since the first lawsuit was filed the day after the accident and there could not have been any doubt that many other lawsuits would follow, time of preparation of

the documents withheld from production is not an issue. The question here is whether "prepared in anticipation of litigation" includes only materials prepared specifically for litigation or perhaps primarily for litigation or whether work product under Rule 26 encompasses a broader category of documents.

There is relatively little authority discussing the question of what is included within the phrase "work product" (most of the cases are concerned with the time element). Professor Moore has defined work product to include "[s]ubject matter that relates to the preparation, strategy, and appraisal of the strengths and weaknesses of an action, or to the activities of the attorneys involved, rather than to the underlying evidence...." 4 Moore's Federal Practice, ¶ 26.64[1] at 26–349—350 (1989). The Seventh Circuit has held that "[o]nly where the document is primarily concerned with legal assistance" is it work product. *Loctite Corp. v. Fel–Pro, Inc.,* 667 F.2d 577, 582 (7th Cir.1981).

Evaluating the claims of work product immunity in this case is complicated by the fact that General Electric almost certainly had more than one purpose in preparing many of the documents in question. One purpose for the general investigation into the cause of the accident, and the many documents generated as a part of that investigation, is defense of lawsuits resulting from the crash. Many of the documents were more specifically prepared for or in relation to the NTSB investigation or Report, although General Electric, as would be expected, certainly did not ignore this litigation while participating in the NTSB investigation. In addition, as noted by one

---

1. If a final document is used for a testimonial purpose, this would change, and underlying documents, including drafts, would have to be produced.

2. Rule 26(b)(3), Fed.R.Civ.P., provides:
 "[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or

agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation...."

court in discussing another air crash, General Electric presumably had a desire "to improve its aircraft products, to protect future pilots and passengers of its aircraft, to guard against adverse publicity in connection with such aircraft crashes, and to promote its own economic interests by improving its prospect for future contracts for production of said aircraft, ..." (*Soeder v. General Dynamics Corporation*, 90 F.R.D. 253, 255 (D.Nev.1980)).[3]

A second complicating factor, resulting obviously from the fact that litigation was a certainty, is that General Electric assigned attorneys overall responsibility for everything concerning the accident. The question then is whether a written communication[4] between General Electric employees (either not sent through an attorney, or sent with a copy to an attorney)[5] or simply a memorandum written for the file as are some of the documents in question, concerning some aspect of the accident investigation, becomes work product because the ultimate findings of the employees will be conveyed to the attorneys who are in charge of the litigation. If that is the case, it is hard to imagine what documents, other than the public NTSB Report, General Electric would be required to produce concerning its findings as to the cause of the accident, given the timing of the first lawsuit (and even if it had been later, the near certainty that any large air crash will result in lawsuits).

 I have attempted to resolve these problems in the following manner. First, whether I have found a particular document to be subject to the qualified work product immunity provided by Rule 26 depends on whether the subject matter of the document concerns preparation or strategy, or the appraisal of the strengths or weaknesses of General Electric's case, or the activities of the attorneys in preparing their case, or is at least "primarily concerned with legal assistance," and not simply underlying evidence (unless communicated to an attorney in a privileged attorney-client communication). *Loctite Corp. v. Fel–Pro, Inc., supra*, 667 F.2d at 582; 4 Moore's Federal Practice, *supra*, at 26–349 —50. Second, since Rule 26 clearly protects party, and not just attorney, preparation, the fact that a particular communication may not go to an attorney does not prevent its being work product. At the same time, if an attorney is simply a "mail drop" for the purposes of trying to create a screen against discovery, and the content of the document indicates it is neither work product nor a communication subject to the attorney-client privilege, the fact that a document is sent through an attorney cannot prevent its having to be produced.

 The conclusion that a document is entitled to work product protection does not end the inquiry. "Factual" work product, which is everything other than the "mental impressions, conclusions, opinions, or legal theories" of the attorneys, Rule 26(b)(3), still must be produced upon a showing by plaintiffs that they need the materials to prepare their case and have been unable without undue hardship to obtain them by other means. *Id.* Generally, a party seeking work product must first show that it has attempted to obtain the equivalent information through other means of discovery, including interrogatories and depositions, or else must show that the material sought cannot be obtained from any other source. *E.g., Hickman v. Taylor*, 329 U.S. 495, 512–13, 67 S.Ct. 385, 394–95, 91 L.Ed. 451 (1947). In this case, plaintiffs have not made the required showing as to any of the documents that I have

---

**3.** In *Soeder*, the court ordered defendant to produce an "in house" investigative report prepared shortly after an air crash.

**4.** Rule 26(b) provides qualified immunity only for "tangible" things. A party can, of course, question a non-attorney witness about his thoughts as to the accident regardless of whether Rule 26 protects from disclosure the documents he prepares.

**5.** General Electric employees were told to route documents through in-house counsel and routinely stamped documents "prepared at the request of an attorney." With respect to many of the documents, however, this has been shown to be an accurate statement only in that attorneys of course had overall responsibility for the litigation and therefore anything that might affect the litigation was important to them.

found to be work product. I will consider a future motion with respect to any document after plaintiffs have attempted other means of discovery.

Applying these principles to General Electric's claims of attorney-client privilege, General Electric's claim of attorney-client privilege as to documents (as identified by General Electric's October 29, 1990 log) 2, 2A, 3, 8 (limited to a handwritten cover memorandum, no. GO147839 and a letter, no. GO147840), 10 (except for the cover sheet of one copy containing handwritten notes beginning "As found large piece"), 15, 16 (limited to cover page GOO85611), 17, 18, 19, 20, 21, 22, 23, 25, 26, 30, 34, 35, 36, 37, 39, 40, 40A, 41, 43, 46 (except for the last two pages labelled "United Airlines Flight 232 Sioux City, Iowa Public Hearing Exhibit List"), 47, 48, 49, 52, 53, 55, 57, 58, 59, 60, 61 (the top page), 62, 63, 65, 67, 71, 73, 83 (the handwritten comments of J. Williams), 84, 85, 86, 89, 92, 94, 95, 96, 97 and 98 is sustained. Accordingly, I have not considered General Electric's additional claim of work product with respect to many of these documents.

Document No. 1 is not subject to the attorney-client privilege. There is no indication that the document discloses client confidences and it consists of counsel's suggestions of positions a General Electric person talking to the media should take. It is, however, counsel's work product since it undoubtedly was formulated with this litigation in mind (and, of course, as with all of the documents, was prepared after the first suit was filed.) Document Nos. 4 and 12 were sent by in-house counsel to 500 General Electric employees telling them to comply with a court order not to destroy documents. There can be no expectation of confidentiality when 500 people are sent a memorandum (indeed the memoranda do not even contain a notation requiring confidentiality). While the cover memorandum that is Document No. 4A was sent to only a few General Electric personnel, it reveals no client confidences, and since the underlying message is the same message sent to 500 persons via Document No. 4, was clearly not intended to be confidential. Document No. 5 is attorney work product, con-

taining thoughts and mental processes of counsel. Document No. 6 is attorney work product. General Electric also claims that it contains client confidences but it has not attempted to substantiate this claim. Accordingly, its claim of attorney-client privilege is not sustained. Document No. 7 is a one sentence note sent by in-house attorney Blume to John Moehring, the General Electric employee in charge of the investigation of the crash and the person responsible for preparing the NTSB report, that contains no client confidence since the fact of outside counsel's representation of General Electric is, of course, known, and otherwise simply notes a meeting between the General Electric employees and a United expert, called, as stated in General Electric's privilege log, to brief the employees. Since there is nothing more stated in the memorandum than what is disclosed in the log (this description is longer than the memorandum), the document is not privileged and cannot appropriately even be called work product. Document No. 8 insofar as it consists of a letter from Michael G. McQuillen to Charles Douglas is not privileged since Mr. McQuillen represents United Airlines (there is no claim of joint defense privilege as to this document). Document Nos. 9, 9A, 9B, and 10 do not reveal client confidence but are attorney work product.

The handwritten comments on Document No. 11 by Louise Cobbs are attorney work product and probably include privileged communications, and are thus subject to the attorney-client privilege as well. The draft itself is work product.

General Electric claims the joint defense privilege as a basis for nondisclosure of Document No. 13. The joint defense privilege is applicable to confidential communications where defendants are engaged in a common defense (which need not be exclusive so long as the communication in question relates to the common interest). *United States v. McPartlin*, 595 F.2d 1321, 1336–37 (7th Cir.1979). The communication in this instance is a letter sent by General Electric attorney Mr. Douglas to United Airlines attorney Mr.

McQuillen, with a handwritten comment apparently to John Moehring, the General Electric employee in charge of the investigation, from in-house counsel Mr. Blume. In this case, however, there is no claim that the document contains confidential client communications. Furthermore, since the same subject matter is covered by the letter that I found not to be privileged in Document No. 8 (there being no substantiation for such a claim there), any privilege would be waived on the same subject matter. In addition, a comment in the letter itself indicates the author has had a discussion concerning the same communication with a "Jim Solon." Mr. Solon is not identified. The note from Mr. Blume to Mr. Moehring also suggests that Mr. Moehring discuss the same matter with a "Dave [unintelligible]". That person is also not identified. General Electric has therefore failed to sustain its burden with respect to confidentiality. Finally, there is no indication in the letter itself that it is conveying either legal advice or the mental impressions of counsel relating to legal strategy.

▇▇▇ Document No. 14 contains no information not contained in Document No. 13. Accordingly, since it is clear that the subject matter and the substance of the communication is not confidential the letter is not subject to the attorney-client privilege. The only additional matter contained in the letter is counsel's request that Mr. Blume bring the matter to Mr. Moehring's attention so that a decision could be reached. That communication does not constitute work product. The letter also contains a handwritten note from Mr. Blume to Mr. Moehring, requesting that Mr. Moehring discuss the subject matter of the letter with someone, but again the person's name is unintelligible as written and not identified by General Electric in its log. Accordingly, I do not even know if the person being referred to is a General Electric employee (although from the substance of the prior document, I do not think so), and General Electric has failed to sustain its burden that this document is privileged or subject to work product immunity.

I have indicated above that the cover page of Document No. 16 is covered by the attorney-client privilege. General Electric says that the remainder of the document, really, separate documents (letters from alleged employees of Timet, also a defendant in many of these cases, dated December 12, 1988, October 7, 1988 and October 29, 1988), and a note from a Jay J. Pardee at the Federal Aviation Administration to Jim Tucker at General Electric, without the "marginal notes" have been provided to plaintiffs. In fact, however, there is only one marginal note and since the underlying documents were not identified in General Electric's log, I cannot determine what was provided plaintiffs. General Electric may redact the single note, and underlining where it occurs, but if it has not done so, must turn over the three letters and the memorandum from Jay Pardee.

Document No. 24 has not been shown to be privileged. The cover sheet of one copy indicates that it was distributed to at least 33 persons, not nine persons as represented by General Electric. Since it is General Electric's burden to show that a document has been kept confidential the very fact that it did not provide counsel for plaintiffs and the court with an accurate distribution list provides sufficient reason to require production. I also conclude that General Electric's description of the document is inaccurate in other respects but since it is clear that General Electric has not accurately described the distribution of the document, I will not go into them. In addition, the document was clearly prepared for nonlegal as well as "legal" review.

▇▇▇ Document No. 27 is a memorandum written by B. Hughes, identified as the General Manager of General Electric's CF6-6/-50/-80A Engine Programs, and sent to 16 General Electric employees, as well as drafts of the memorandum. General Electric claims both attorney-client privilege and work product immunity as to the documents. General Electric represents, and Mr. Blume so attests in his affidavit, that this document was prepared at his request. It is clear to me after reviewing hundreds of pages of General Electric doc-

uments, that Mr. Blume acted in this case almost exclusively as a conduit, principally to relay messages among General Electric employees and between General Electric employees and outside counsel, and also apparently to attempt to shield from discovery documents otherwise discoverable. The only legal advice provided by Mr. Blume that I found in all of these documents concerned the non-destruction of documents, pursuant to court orders, and instructions concerning responses to document requests, instructions regarding scheduling and procedures to follow in preparing the NTSB report and submissions. These are tasks routinely engaged in by in-house counsel.[6] Virtually all substantive legal advice provided by lawyers that is reflected in any of the pages of General Electric documents reviewed by me came from outside counsel. Numerous documents, including Document No. 27, were sent to various General Electric employees, with one copy to Mr. Blume. Thus, although Document No. 27 was purportedly drafted at Mr. Blume's request, in fact it was sent to Messrs. Blume, Moehring and Tucker as well as from 9–13 (nine are listed; others are noted on the log) other General Electric employees. It is addressed to "Distribution." Apart from the stock phrase at the top "Privileged–Prepared at Request of Counsel" which General Electric employees routinely put on documents concerning the accident, there is nothing in the document itself that indicates it is either addressed to Mr. Blume or prepared at his request. Accordingly, based on my review of all the documents, I have serious questions about the accuracy of Mr. Blume's statement. Whether or not it is accurate, however, the document does not seek legal advice (and if it did, clearly sought non-legal advice as well). It has therefore not been shown to be subject to the attorney-client privilege. I also conclude that it is not work product as interpreted by the Seventh Circuit. The doc-

ument discusses a meeting between representatives from the FAA, General Electric, Pratt & Whitney, Rolls–Royce and "SNEC-MA," at which various matters were discussed relating to topics including titanium safety, an industry protocol to respond to court orders that hinder accident investigation, and inspection of manufacturing parts. There is no indication that the discussion, or Mr. Hughes' memorandum, focused primarily, or even peripherally, on the present litigation as opposed to litigation and safety generally.

Document No. 28 is a handwritten note from one General Electric employee to two others. The document contains no confidential information provided to any lawyer, and seeks no legal advice. Nor is it in any way work product. (In fact, it appears it probably accompanied two copies of Document No. 24, judging from the comment and the date.)

Document No. 29 consists of technical findings and information and was prepared by two General Electric employees. General Electric represents that "equivalent" information has been provided plaintiffs, but I have no way of determining this. Since the document appears to contain purely technical information, apart from a few word changes apparently provided by Ms. Cobbs, I conclude it is not privileged.[7] The handwritten word changes may be redacted.

Document Nos. 31 and 32 are work product. Document No. 33 was sent by John Moehring to both General Electric personnel and counsel. It does seek advice but it is unclear that he is seeking legal advice and I conclude from the document and others that in writing this document Mr. Moehring almost certainly sought non-legal advice as well. Accordingly, under the cases cited above, it is not subject to attorney-client privilege. It is, however, work product and at this point, plaintiffs have

---

**6.** Mr. Blume is identified as Counsel, Commercial Engine Operations at General Electric's Engine Group in Evensdale, Ohio.

**7.** At the top of the document, there is a handwritten notation stating that the document was

"prepared for attorneys." No affidavit supports this statement, however, and the document itself does not give this appearance in either form or content.

not shown sufficient need for the information.

Document No. 42 has not been shown to disclose any client confidence and is therefore not subject to the attorney-client privilege. It is, however, work product.

 Document No. 44 was clearly prepared for non-legal as well as legal comment (it was actually sent by General Electric employee Bill Thompson to John Moehring, who then "suggested," as stated in the memorandum, that Mr. Thompson send a copy to Mr. Craft for his information). General Electric's representation in its log that this was a "handwritten memorandum to counsel" apart from the cover sheet is simply false. Since the document was prepared for non-legal review, it is not subject to the attorney-client privilege. Although General Electric also claims work product immunity apparently on the ground that it "concerned the preparation of the post-hearing submission to the NTSB," I find nothing in the underlying document sent from Mr. Thompson to Mr. Moehring to indicate that its purpose was anything other than general thought and analysis concerning the cause of the crash and General Electric has not referred me to any affidavit to substantiate its claim.[8] This document, therefore, so far as has been shown to me, squarely presents the question whether all internal investigation and analysis following an accident becomes work product once a lawsuit is filed. As indicated above, following the Seventh Circuit's language in *Loctite Corp.* and Professor Moore's definition, I conclude that the answer is no. In this case, the top page of Document No. 44 (the memo from Mr. Thompson to Mr. Craft) meets that description, but the underlying memorandum from Mr. Thompson to Mr. Moehring does not. That portion of Document No. 44 must therefore be produced.

The top page of Document No. 45 is an attorney-client communication subject to the attorney-client privilege. The remainder of the document, however, consists of what appears to be a "cold" solicitation letter from a Russell G. Hardy of Russ Hardy Co. in Wellesley, Mass. sent to Joseph Corrado, a General Electric employee, with copies to a Jerry Clark, Rick Kennedy and Robert French. The communication also included a brochure from the company. Mr. Moehring received it and noted it originally was sent to the wrong "Gerry Clerk." Since this letter was never intended to be privileged, and was sent from a person General Electric had neither retained nor apparently solicited, it must be produced.

Document No. 50 was prepared for non-legal as well as any legal advice and concerns visits by General Electric employee Charles Cutfield to Douglas Aircraft and with FAA officials. It is not subject to the attorney-client privilege. It directly concerns the NTSB investigation, however, and in the context of the document is work product.

 Document No. 51 actually consists of 36 different documents. They are all handwritten notes, apparently by Mr. Moehring, said to have been taken at meetings at which General Electric counsel were present. However, General Electric has failed to document who was at the meetings and has failed to sustain its claim of privilege for this reason. In addition, General Electric, as it has done many times in its log, claims attorney-client privilege because it says legal advice was given. As discussed at the beginning of this opinion, that is not a sufficient basis for claiming privilege. Finally, I am unable to even read all of these notes. I cannot sustain a claim of privilege as to an unintelligible document.

Document No. 54, contrary to General Electric's representation, contains no legal advice and is not work product. It consists of a cover letter from Mr. Moehring to three General Electric employees in which he notes than an underlying document (not part of document 54) sent to him from Ms. Cobbs "has no useful advice or comment."

Document No. 55A seeks non-legal as well as any legal advice. It is therefore

---

8. The document bears a stamp stating it is privileged. That does not make it so and I do not know when or who may have placed the stamp on the document.

not subject to the attorney-client privilege. However, it concerns a draft of the NTSB report which because of its relationship to this litigation, and General Electric's preparation of that Report with this litigation in mind, is work product.

Document No. 56 consists of another solicitation in this case by a R.M. Edward, Jr. of Edward Research Group, Inc., suggesting that General Electric hire certain attorneys that Mr. Edward apparently represents. The claim of work product privilege is frivolous.

General Electric represents that the document, apart from the top page, that is Document No. 61 has been produced without editing notes by Ms. Cobbs. The notes are work product. (It is also claimed to be subject to attorney-client privilege but since the sole claim is that Ms. Cobbs provided advice and there is no indication that the advice included confidential client communications, the notes have not been shown to be subject to the attorney-client privilege.)

Document No. 64 consists of minutes of an engineering meeting concerning the accident investigation and directly related to the litigation. It is, as General Electric claims, work product. Document No. 66 is also work product.

Document No. 68 is a draft of a paper prepared by Mr. Moehring for external release to plaintiffs if "needed." It concerns Mr. Moehring's desire to have ongoing access to the No. 2 engine on the United Airlines aircraft that crashed. General Electric has not shown (or even alleged) that the factual information was intended to be, and in fact remained, confidential; it is therefore not subject to the attorney-client privilege. It does, however, contain Mr. Moehring's analysis of events concerning the crash and directly concerns the litigation. Accordingly, it is work product.

Document No. 69 is a cover memorandum written by Mr. Moehring. It appears to refer to Document No. 68. Document No. 69 does not seek legal advice, nor, contrary to General Electric's representations, does Document No. 69 "provide counsel with information concerning the engine hardware." The document was sent to a General Electric management official and neither appears to have been sent, nor has General Electric shown, that it was sent, for the purpose of enabling the official to provide further information to counsel. Accordingly, it should be produced.

Document No. 70 is work product.

Document No. 71 consists of a draft of a technical description concerning immersion ultrasonic inspection programs for titanium components of aircraft engines. General Electric does not state the purpose for which the document was prepared or what was done with the document. I am unable to determine whether the underlying data, which is purely technical, has been supplied to plaintiffs or to whom the draft memorandum was shown. Furthermore, unlike most of the documents at issue, while the advice provided (as reflected in the handwritten notes) may, as General Electric states, have been concerned with this litigation, it is not obvious from the document itself that it primarily concerned this litigation, or that it would not have been prepared in exactly the same way even if no suit was ever filed or expected. I do agree that the handwritten comments are covered by the attorney-client privilege. Since General Electric has not provided the information necessary to make a determination regarding privilege as to the draft, however, with redactions of comments, it shall be produced.

Document No. 72 is described as a draft (the final product of which is stated to have been given to plaintiffs) of a paper regarding a CF–6 fan disk inspection program prepared by General Electric employee J. Moll in connection with the investigation of the United crash. General Electric claims work product protection for this document on the ground that "Mr. Moll received legal advice from outside counsel R. Craft in light of issues in pending litigation," which advice is "reflected in the draft." However, according to General Electric's log, the handwritten notations were apparently made by the author of the document, Mr. Moll. Thus, while if the document met the requirements for work product protection

under Rule 26, whether or not it reflected the "mental impressions of counsel" as claimed by General Electric would not be the issue, I am unable to determine from what has been presented to me either that the document was prepared in anticipation of litigation (there is nothing in the document itself that supports such a theory) or that it contains the mental impressions of counsel (or where). Accordingly, since General Electric has failed to sustain its burden of proof, the document shall be produced.

Document No. 74 is work product. Document No. 75 was prepared specifically in connection with the NTSB Report but appears to have had in mind the current litigation. Accordingly, it is work product as defined in Rule 26. The same analysis applies to Document No. 76. Document Nos. 77, 78, and 79 are drafts of a letter to a member of Congress concerning questions posed to General Electric during hearings on the United accident, for which the attorney-client privilege is claimed but no basis for such a claim has been shown to exist (there is no claim that it contains confidential client communications—General Electric says only that it would reveal a client communication—and no affidavit to support such a claim). They are, however, work product.

Document No. 80 was prepared by a General Electric employee and was sent to both legal and non-legal persons for comment. General Electric's claim that this document is protected from discovery by the attorney-client privilege because it "reflects mental impressions of counsel" misstates the law. However, it does appear to have been prepared with concerns for this litigation in mind and accordingly, is work product. Document Nos. 81 and 82 are work product for the reasons stated as to Document No. 80. General Electric's claim that these documents are subject to the attorney-client privilege is not substantiated by the record. (I also find no substanti-

ation in the documents or affidavits that these documents were "prepared at the request of counsel." Here, General Electric does not even identify who the supposedly requesting counsel may be.)

Document No. 83 is protected from disclosure by the work product doctrine (the handwritten comments are also subject to the attorney-client privilege).

Document No. 88 (actually two documents) is the work product, as defined in Rule 26(b), of General Electric employees Moehring (top page), Tucker, Blume, Lennard and Van Duyne. General Electric's claim of attorney-client privilege has not been substantiated. Document No. 90 is work product within Rule 26(b) (although, contrary to General Electric's representation, there is no indication that it "reveals attorneys' thought processes and opinions").

Document No. 91 contains General Electric employee Mr. Moehring's thoughts concerning items that should be covered in the NTSB Report. As such, since I have concluded that the NTSB Report was prepared "with an eye to litigation" and specifically with this litigation in mind, it is work product.

Document No. 93 was a memorandum ostensibly addressed to Mr. Blume that in reality contains a message to the General Electric employees involved reminding them that they should circulate drafts through Mr. Blume. It contains neither confidential information nor does it seek legal advice. It also fails to contain any information that could conceivably be work product within Rule 26, Fed.R.Civ.P. Finally, contrary to General Electric's representations, there is no indication that "Mr. Tucker is acting for Mr. Blume in transmitting the memorandum."

 The remaining documents for which General Electric claims either attorney-client privilege[9] or work product im-

9. As to these drafts, I have not considered General Electric's claim of attorney-client privilege. Based on my detailed review of the documents discussed above, I think it highly unlikely that the claim could be sustained as to many of them. Since they generally are work product, although not for the reasons stated by General Electric, unless plaintiffs make a sufficient showing of need, they need not be produced anyway. Accordingly, I have not added to what

munity are drafts of General Electric's post-hearing NTSB report or drafts of other materials sent to the NTSB. In addition, McDonnell Douglas claims work product protection for 50 drafts of the report McDonnell Douglas submitted to the National Transportation Safety Board following hearings by the NTSB into the cause of the crash, six draft storyboards of a video presentation given to the NTSB by McDonnell Douglas said to have been prepared by a consultant to McDonnell Douglas outside counsel, and six drafts of summaries of the testimony accompanying the videotape shown at the NTSB hearing, said to have been prepared by an outside attorney representing McDonnell Douglas in this litigation. Pursuant to plaintiffs' agreement, none of the McDonnell Douglas documents have been submitted for *in camera* inspection and I have not reviewed the General Electric drafts (NTSB Nos. 1–58). The parties agreed that the sole issue with respect to all of the drafts is whether the fact that the final product became public eliminated a claim of work product immunity for underlying drafts. As indicated in the discussion of work product earlier in this opinion and specifically in connection with various General Electric documents, I have concluded that the drafts, if they are otherwise work product, do not lose that status because the final document is made public. (Indeed, any other result would make every attorney's draft briefs subject to discovery.) The fact that drafts were written by a non-attorney makes no difference under Rule 26 if a primary concern in drafting the document is defense of litigation.

has been a time-consuming task by evaluating the attorney-client privilege as to these drafts.